UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                        PLAINTIFF


v.                                        CRIMINAL NO.:  3:19CR-24-JHM


KENNETH LLOYD THOMAS                                        DEFENDANT

## POST HEARING BRIEF OF THE UNITED STATES
### *Filed Electronically*

Comes the United States of America, by counsel, and files the following post hearing brief on the defendant's motion to suppress evidence, and states as follows:

### FACTS

Testimony of Det. William Mayo

Detective William Mayo was the first witness at the hearing held on October 7, 2019. Mayo has been a Louisville Metro Police officer for six and one-half years, most recently serving with LMPD's Ninth Mobile Division. (Mayo, Transcript of Evidentiary Hearing at 4).  Mayo described this as a violent crime unit which receives orders on areas to patrol from the Majors of the City's stationary police divisions who pore over "crime map" and task them with patrolling areas with a "high propensity for violent crime." (Id.). Typically, Ninth Mobile detectives travel in unmarked vehicles with 2-3 per car. Once a stop or contact has been made, other Ninth Mobile detectives will be in the area to provide backup. (Mayo at TS 5, 55).

On October 4, 2018 At approximately 7:25 p.m., Mayo testified that the vehicle he occupied, along with two other detectives, pulled into a turn lane at Rockford Lane and Cane Run Road in Louisville. The vehicle in front of them, a 2006 Chevy Tahoe, with tinted windows, was

registered to the defendant, Kenneth Lloyd Thomas. Mayo testified that even though the rear windows were tinted, it was "clearly obvious" that the driver and passenger of the Tahoe were not wearing seatbelts. It was obvious because the officers were "directly behind" the Tahoe and the "sun backlights our view whenever we're behind cars like that . . . ". (Id. at TS 6).

Although Mayo conceded that there was a possibility that they had been beside the Tahoe before getting behind it at the stoplight, he was adamant that the officers had no "preconceived notion of stopping it" and made the decision to "pull them over" only when they "saw that there was a seatbelt violation." (Id. at TS 7, 23).   Mayo described the decision to stop the Tahoe as a joint one between the three officers but was not sure when the driver of the police car, Detective Robbins, decided to engage the police lights and pull them over. After the turn onto Rockford lane, it was Mayo's opinion that the Thomas vehicle took an "abnormal amount of time" before he pulled over. (Id. at TS 7).

Prior to the stop, Mayo testified that there was movement (inside the vehicle) from the "front of the vehicle . . . to the person in the back seat." He testified that, "We called it out. We talked about it (and) said, they're moving, they're moving, they're moving." (Id. at TS 8). When asked if this was unusual, the detective replied,

> "Usually when we find contraband or illegal substance in the backseat, we see movement. It's clearly observable when people are trying to stuff things under the seat or next to them or throw things in the back."  (Id. at TS 9).

When cross-examined on the issue of the video not containing the "they're moving" statements, Mayo responded that his video was not turned on until he had exited the police car. (Mayo at TS 28). When asked if it were not true that the videos of other officers only described furtive movements in the back seat of the car, Mayo responded, "I know (what) I saw." (Id. at TS 29).

The two officers in the front of the police car (Mayo was in the back) exited and approached Thomas's vehicle near the Saddlebrook Apartments on Teaneck Lane. (Id. at TS 9). They talked with Thomas and the passengers and brought back "information to start our investigative process." (Id.). A still photo of Detective Flynn opening the rear right passenger door of the Tahoe clearly depicting that none of the occupants wore seatbelts was attached as exhibit 2 of the United States' Response to Motion to Suppress Evidence (R. 20, Response at 3).

Prior to pulling Thomas over, Mayo testified that one of the officer's in the vehicle, ran the license tag of the Tahoe and determined the owner had an outstanding warrant for his arrest from Pennsylvania. Mayo testified that at 6 minutes and 14 seconds into the stop was when he learned that it was the driver, Thomas, who had the warrant. (Mayo at TS 11). Armed with this information, Mayo stated that he "didn't feel comfortable" leaving Thomas in the vehicle. He explained that when drivers know they have an outstanding warrant, and they have been stopped by police, they often make an effort not to get caught and often times "they'll flee" either on foot on in their vehicle.  (Id. at TS 12-13). So, I was trying to get him out of the car so we could have a safe conversation about it (the warrant). (Id.).

At the hearing, Mayo described Thomas as giving him "pushback" during their conversation while he was in the driver's seat. However, by the time Thomas agreed to get out and was brought to the back of the car, Mayo stated, "we had a very cordial conversation . . . we shook hands."  (Id. at TS 13-14).  Mayo later learned that Pennsylvania authorities were not requesting extradition on the warrant issued for Thomas. He initially was not certain when that occurred,, but after reviewing his body-cam he stated, "obviously I learned the warrant was not extraditable after I pulled him out of the vehicle." (Id. at TS 61).

It was while having his conversation with Thomas that Mayo noticed the smell of marijuana. "I could smell marijuana from right at that door . . . there's nothing that smells like it . . . ". (Id. at TS 12.)  He stated that the marijuana he smelled was "bagged marijuana . . . in its green form and he could smell the marijuana even while Thomas was still in the vehicle. He noted also that 8 grams of marijuana in two baggies was found in the back seat. (Id. at 12, 36).   It was at this point that Mayo testified he decided to search the car regardless of the open container of alcohol which was found later. (Id. at TS 14).

On cross-examination met skepticism. When asked if he can smell marijuana through clothing and plastic baggies, Mayo replied, "I'm testifying yes. I smell marijuana through baggies all the time." (Id. at 12, 37).   When asked if he had asked other detectives if they had smelled marijuana in order to establish probable cause, he replied, "I already (had) probable cause to search that vehicle because I myself smelled the odor of marijuana and I knew what marijuana smells like being involved in hundreds of drug investigations." (Id. at 39).

Finally, it was during this conversation with Thomas "about the warrant and some other things" that Mayo learned that a gun was found in the vehicle by another officer. (Id. at TS 13). He testified that his, "sergeant at the time, lieutenant now—is the one who found the firearm." (Id.).  It was only when after finding that a gun was present, and with the added fact that Thomas was a previously convicted felon, that the decision was made to him. Otherwise, Mayo stated, we would have cited him, "and sent him on his way."  (Id. at 14-15).

<u>Testimony of Lieutenant Robert King</u>

Lieutenant Rob King was the next witness. King, a 13 year veteran of the Louisville Metro Police Department, was a Sergeant on October 4, 2018, when the stop occurred. (King at TS 62-3). He was with the Ninth Mobile Division (and its former designation as Viper Unit) from May

of 2012, until just two months prior to the hearing (Id.). At the time of the stop, he was present as "backup" to "the traffic stop of Detective Mayo." King explained that this is the way, "our unit is set up (and) we kind of traveled as a group from area to area . . . if they need any assistance." (Id. at TS 63-4).

On October 4, 2018, King and another officer, Sergeant Kevin Casper, arrived on the scene while Mayo was engaged in talking with the subject at the driver's door. When the occupants "got out of the vehicle" he and Casper approached the passenger or "left side" to provide assistance. (Id. at TS 65).  When the passenger of the vehicle stepped out, King immediately observed an, "open bottle of some kind of alcohol . . . I'm not sure if it was bourbon or whatever it was, but it was right on the front seat when the passenger got out." (Id. at TS 66).  In addition to having an unobstructed view of the bottle, King testified he could smell alcohol as well, emanating from the front of the car where the bottle was located. He could not be sure if the smell came from the front of the car or from the bottle itself. (Id. at TS 80, 90). [1]

King testified that based upon his years of training and experience that observing an open container of alcohol in a vehicle was justification to search the remaining parts of the vehicle. (Id. at TS 66, 91). After advising Mayo and receiving the go-ahead, King searched the vehicle's front seat area and, "didn't see anything." (Id. at TS 68).  In the back seat, King testified that he found two "motorcycle vests" with the word "untouchables" on the back. (Id.). He picked up one of the vests, took it to the rear of the vehicle, and asked, "who's is this?" One of the occupants of the vehicle replied, "its mine." (Id.).  When he repeated the procedure for the second vest, the same

---

[1] At the hearing, King described the liquor bottle as open. Counsel for the United States referred to the bottle as "corked" during the hearing; however, a second look at the photo of the bottle, entered into evidence at the hearing, is not definitive. For his part, King looked at the photo of the bottle taken from his body cam (marked as Government Exhibit 1), and confirmed it as the bottle he described as open. (King at TS 89).

man mumbled something King could not understand. (Id.) This vest, the heavier of the two, is the vest found the .380 caliber Remington pistol which is the subject of this case. King testified that he also found the Kentucky title to a motorcycle in the same pocket. This title was in the same name as that of the defendant, Kenneth Thomas.  (Id. at TS 68-9).

## **ARGUMENT**

### The stop of the Defendant's Vehicle was Reasonable

The stop of the Defendant's 2006 Chevrolet Tahoe was based on" reasonable suspicion to believe that a traffic violation had occurred." See *Whren v. United States*, 517 U.S. 806, 812-3 (1996).  Detective Mayo denied any preconceived intention to stop the defendant's vehicle or even of his identity prior to the stop. "I had never laid eyes on him before" was his testimony. (Mayo at TS 23, 34).[2] What we are left with is three detectives at a redlight immediately behind the Thomas with every opportunity to observe the violation.  The color photograph from Det. Flynn's bodycam, attached as Exhibit 1 to our original response, clearly demonstrates the opportunity to observe that the defendant and his passengers were not wearing seatbelts in violation of Kentucky law.

### Mayo's demand that the driver and passengers step out was also reasonable

Mayo's demand that Thomas and his passengers exit their vehicle was also reasonable. The Supreme Court held in *Pennsylvania v. Mims*, 434 U.S. 106, 111 n.6 (1977) that, "once a motor vehicle has been lawfully detained for a traffic violation, police officers may order the driver to get out of the vehicle without violating the Fourth Amendment description of "unreasonable searches and seizures." At the hearing, Mayo explained that at the time the decision was made to ask the driver of the Tahoe to step out, he was aware that an outstanding warrant existed for his

---

[2] Even if Thomas had established that the officers knew him prior to the hearing, their motives are irrelevant as long as they observe a traffic violation. *Whren* , 517 U.S. at 813.

arrest. His experience was that in these circumstances, persons often flee to avoid arrest. (Mayo at TS 12-13).

Likewise, asking the passengers to exit the Tahoe was also reasonable. In *Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997), the Supreme Court held that, "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car . . . (w)e therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." The body cam videos in evidence at this hearing reveal the caution used by both officers in approaching the open driver's side and front seat passenger side windows of the Tahoe. Both used their flashlights to illuminate the inside and slowly approached the front. Their caution demonstrates just the concern for officer safety addressed in *Maryland v. Wilson,* Id.

<u>The length of the stop was reasonable</u>

Once the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened during the stop to cause the officer to have a "reasonable and articulable suspicion" that criminal activity is afoot. *United States v. Davis,* 430 F.3d 345, 353-4 (6th Cir. 2015) quoting *United States v. Hill*, 195 F.258, 264 (6th Cir. 1999).

 In Thomas's case, a succession of issues confronted Mayo and the other officers. First, the stop itself,  based upon the reasonable suspicion that the occupants of the Tahoe were not wearing seatbelts (which Thomas has never denied and for which he was eventually cited).  Second, the records check revealed that the owner of the Tahoe had an outstanding warrant for his arrest from Pennsylvania. It was with this information, at 6 minutes and 14 seconds into the stop, that Mayo made his decision to ask the driver and passengers to exit the vehicle. But, that did not end the issue as Mayo utilized several minutes to persuade Thomas that Supreme Court case law required

him to get out of his car after a lawful stop. The defendant can finally be observed exiting the Tahoe at 8:04 minutes.

With the passengers out of the car, Lieutenant Rob King first observed the open container of alcohol on Thomas's front seat and notified the other officers. Mayo, who was in charge, advised him to proceed with the search. King first searched the front seat are of the Tahoe and found nothing. At approximately 13:22 on Mayo's video, a search of the rear seat of the vehicle is obviously underway with the vest containing the handgun still observable on the seat. Just over one minute later, at 14:56, the officers can be observed checking the driver's licenses of driver and passengers for warrants on a laptop located on the hood of their police vehicle. The warrant for Thomas was found, along with a warrant for the rear seat passenger. By 17:48, also on Mayo's video, the gun was removed from the vest which by then is laid out on the hood of the police car. It was at this point that Mayo testified that he made the decision to arrest defendant Thomas.

In *Sharpe v. United States,* 470 U.S. 675, 686 (1985) the Supreme Court provided guidance in assessing whether a traffic stop was too long in duration, stating, "we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ".  Calculating the elapsed time on the police videos entered into evidence for this hearing is not an exact science. However, it is obvious that by 20 minutes into the stop, the officers had conducted the search, found the firearm in Thomas's motorcycle vest, and learned he was a convicted felon. During this period of time, they had also learned the vehicle was registered to Thomas, that a warrant from another state existed for his arrest, and that he was the driver. Later they learned that the other state was not requesting extradition. These issues were investigated, all within 20 minutes from the initial stop. We submit that length of the stop was reasonable and that these officers used the time of the detention of the suspects wisely.

<u>The search of vehicle based upon open container of alcohol was reasonable</u>

We have reviewed and incorporate by reference here the portion of Response to Motion to Suppress Evidence dealing with the search of Thomas's vehicle based upon the open container of alcohol found in the front of Thomas's vehicle. (R. 20. pp. 52-55).

<u>Even without King's search, the firearm would inevitably have been discovered</u>

Notwithstanding the discovery of the firearm as the result of the open container search of Lieutenant King, the gun would inevitably have been discovered by Detective Mayo's search for marijuana. At the hearing, Mayo was adamant that he smelled marijuana after approaching the driver's side window of the 2006 Chevy Tahoe which Thomas was driving. (Mayo at TS 12, 37-9, 53). Mayo further testified that upon smelling the marijuana in its green form emanating from the Tahoe, it was his intention to search the vehicle regardless of the fact that Lieutenant King subsequently conducted a search and found two baggies containing 8 grams of marijuana, in two baggies, located in the back seat. (Id. at 14, 37).

One of the recognized exceptions to the exclusionary rule is the doctrine of inevitable discovery. Under the doctrine, "if the prosecution can establish by a preponderance of the evidence tha the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale (of the exclusionary rule) has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984).

Sixth Circuit law could not be more clear. When officers smell the odor of marijuana coming from a defendant's vehicle, they have probable cause to search the vehicle without a warrant. Most recently, in *United States v. McKinley*, 753 Fed. Apx. 871, 873 (May 24, 2018) the Court of Appeals held, "we have repeatedly held that the smell of marijuana establishes probable

cause to search a vehicle." citing, *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993).

In the Sixth Circuit, inevitable discovery applies when, "the government can demonstrate . . . the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence . . . ". *United States v. Keszthelyi,* 308 F.3d 557, 574 (6th Cir. 2002). In Thomas's case, not only did an experienced officer with "hundreds" of drug searches testify that he smelled marijuana from the open window of Thomas's vehicle, he continued to smell it after Thomas had left the car and he was being frisked. (Id. at 14). Finally, there is no doubt that at least 8 grams of marijuana, in two baggies, was present in the back seat of Thomas's vehicle.

## CONCLUSION

The hearing conducted in this matter demonstrates that the actions of Detectives Mayo, Flynn and Robbins, and of Lieutenant King, were reasonable. In not more than thirty minutes, officers observed and conducted a traffic stop based upon the driver and passengers of a vehicle not wearing seatbelts. That much is uncontested.

In addition, officers conducted a search of computer records and determined that the driver had an outstanding warrant for his arrest from another state. Continued checks determined that the warrant was non-extradictable; that is, was not an issue to cause the defendant to be detained. However, after spending approximately three minutes discussing Constitutional law with the defendant and getting him to voluntarily exit his car (for sound reasons) other detectives observed an open container of alcohol on the front seat of the car.

Based on years of training and experience, these officers conducted a search based upon the finding of this open container and found a loaded handgun in a vest in the backseat. A vest which appeared to have been thrown there once police lights had been turned on to execute the

stop and also contained a bill of sale for a motorcycle with the defendant's name on it. When another computer check determined that the driver, whose vest contained the gun, was also a previously convicted felon, officers arrested him.

Respectfully submitted,

RUSSELL M. COLEMAN
UNITED STATES ATTORNEY

/s/*Randy Ream*
Randy Ream
Assistant United States Attorney
717 West Broadway
Louisville, Kentucky 40202
(502) 582-6023 (phone)
(502) 582-5912 (fax)

## CERTIFICATE OF SERVICE

On October 31, 2019, I electronically filed this document through the ECF system, which will send notice to counsel of record.

/s/*Randy Ream*
Randy Ream
Assistant United States Attorney