UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                          PLAINTIFF

v.                                              CRIMINAL NO.:  3:19CR-24-JHM

KENNETH LLOYD THOMAS                                          DEFENDANT

*Filed Electronically*
**<u>MOTION TO RECONSIDER</u>**

Comes the United States of America, by counsel, Assistant United States Attorney Jo E. Lawless, and respectfully requests the Court to reconsider its Memorandum Opinion and Order (DN 36), insofar as it suppresses the evidence in the case at bar and, more specifically, the credibility determination concerning Detective William Mayo.

I.    <u>General background</u>

On October 4, 2018, Louisville Metro Police officers stopped a car being driven by Kenneth Lloyd Thomas.  The police stopped the car because no one in the car was wearing a seatbelt.  A records check showed that all three of the men were convicted felons, and that Thomas had an outstanding warrant from Pennsylvania.  While other detectives were checking to see if the Pennsylvania warrant was extraditable, Detective Mayo asked Thomas to get out of the car (which he eventually did).  While at the car window talking to Thomas, and then subsequently while frisking him for weapons, Detective Mayo smelled bud (*i.e.*, unburnt), marijuana.  Things were moving quickly.  Soon after the initial stop, a lieutenant on the scene, (*i.e.*, Lt. King), noticed an open container of alcohol in plain view.  The police believed the open container gave them probable cause to search the car--where they found a gun and a small amount of marijuana.  Another detective found a larger bag of bud marijuana in Thomas's pants

pocket while searching Thomas.  Detective Mayo did not mention his earlier smelling of marijuana to anyone on scene.  In view of what was happening, apparently he saw no need to in light of the "no seat belts" stop and "open container" search.

On February 20, 2019, a federal grand jury returned an Indictment charging Thomas with being a felon in possession of a firearm.  (DN 1).  On August 14, 2019, the defense moved to suppress the evidence police seized from Thomas's person and his car.  (DN 15).   The defense argued that officers searched Thomas's car without probable cause because a violation of KRS § 189.530(2) (open container law) was not a crime in Kentucky.  *Id*. at 3.  If not a crime, then that statute could not provide probable cause to search.  The United States now concedes this point.

For the reasons that follow, however, the United States asks the Court to consider evidence not previously presented in formal fashion.  An Investigative Report prepared in conjunction with the October 4, 2018, stop, search, and arrest was referenced during the suppression hearing by the prosecutor, Detective Mayo from the witness stand, and defense counsel.  (DN 24 at 12, 31, 32).  But, the report was not tendered as an exhibit.  This is line with general practice as the author of the report testified in a manner consistent with the report.  Only later, when claims amounting to recent fabrication were raised, did the specifics of the report become significant.  The report is attached hereto as Exhibit A.

II.     <u>Suppression Hearing</u>

This Court held an evidentiary hearing concerning the motion to suppress during which the United States called two witnesses, LMPD Detective Mayo and Lieutenant King.   (DN 24 at 1-154).   Unfortunately, the hearing resulted in confused, incomplete, and inaccurate information on several points.

Offered now as an explanation--not as an excuse -- the United States acknowledges the prosecution was not fully prepared for the hearing as it related to Detective Mayo smelling marijuana.  The issues, as framed prior to the hearing, concerned the basis for the stop (*i.e.*, no seatbelts), and the search stemming from the open container of alcohol.  While the smelling of marijuana was raised during the hearing, not much time was spent on it.

At the hearing itself, testimony was not elicited that would have allowed Detective Mayo to clarify information that was apparently important to the Court.  For example, testimony concerning actions that were taken during the October 4 stop in the context of usual procedures utilized by the Ninth Mobile Unit was not presented.  Additionally, the type of information included in a Uniform Citation as compared to an Investigative Letter/Report was not addressed.  However, based on the limited testimony concerning smelling marijuana, the United States raised inevitable discovery in its post-hearing brief.

After the evidentiary hearing and post-hearing briefing, this Court issued a Memorandum Opinion and Order.  (DN 36).  The court held as follows:  (1) the stop was legal; (2) the scope and duration of the stop was legal; (3) the open container of alcohol did not provide probable cause for the search; and (4) the inevitable discovery principle could not save the search because of a credibility determination on the issue of whether Detective Mayo smelled marijuana.  *Id*. at 3-16.

III.     Smell of marijuana and inevitable discovery

The exclusionary rule is a judicial remedy that is "restricted to those areas where its remedial objectives are thought most efficaciously served."  *Segura v. United States*, 468 U.S. 796, 804 (1984) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). "The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal

search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura*, 468 U.S. at 804 (citations omitted).  But not all evidence is "'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 487-488 (1963) (citation omitted).  "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.*

Importantly, as the Sixth Circuit recognized, the Supreme Court has "declined to adopt a 'per se', or 'but for,' rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." *United States v. Gross*, 662 F.3d 393, 401 (6th Cir. 2011) (quoting *United States v. Ceccolini*, 435 U.S. 268, 276 (1978) (citing *Brown v. Illinois*, 422 U.S. 590, 603 (1975)). Rather, "the indirect fruits of an illegal search or arrest should [only] be suppressed when they bear a sufficiently close relationship to the underlying illegality." *New York v. Harris*, 495 U.S. 14, 19 (1990).

Determining whether there is a fruit of a poisonous tree thus has several components. Assuming arguendo that there is an unlawful police action, the first question is whether the activity caused the acquisition of the challenged evidence.  This causal relationship is sometimes couched in terms of whether there is an "independent source" for the evidence. Under the independent source doctrine, evidence will be admitted if the United States can show it was discovered through sources "wholly independent of any constitutional violation." *Nix v. Williams*, 467 U.S. 431, 442-43 (1984).  "The doctrine ensures that the United States is not

penalized for wrongdoing when such wrongdoing would not bear on the outcome of the case." *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996). "In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source unrelated to and independent of the unconstitutional [action]." *Murray v. United States*, 487 U.S. 533, 538–39 (1988) (citation omitted).

For cases where the unlawful police activity did cause the acquisition of evidence, then the quite different next question is whether the "taint of the illegality" has become so attenuated that the illegality has been purged (attenuation doctrine) or "by means sufficiently distinguishable" (inevitable discovery). "The Supreme Court has recognized various doctrines, sometimes referred to as 'exceptions' to the exclusionary rule that offer guidance for its proper application." *United States v. Figueredo-Diaz*, 718 F.3d 568, 574 (6th Cir. 2013).

One exception is the inevitable-discovery doctrine which allows evidence secured through unlawful means if the prosecution can show that it "ultimately or inevitably would have been discovered by lawful means[.]" *Id.* (quoting *Nix*, 467 U.S. 431 at 444). "The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine." *Murray*, 487 U.S. at 539.

As noted above, the United States concedes error with regard to searching the car based on an open container of alcohol. Nevertheless, suppression of the firearm is not required because Detective Mayo's smelling marijuana justified further search of Thomas and the interior of the car. This is so because the burden of proof for inevitable discovery is preponderance of the evidence. *See Nix*, 457 U.S. at 444. And, the Sixth Circuit has repeatedly held that the smell of marijuana establishes probable cause to search a vehicle. *See United States v. McKinley*, 735

Fed.Appx. 871, 873 (6th Cir. 2018) (citing *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993)).   Detective Mayo testified that once he smelled the odor of marijuana when he approached the car, followed by smelling marijuana on Thomas during the pat down, he "was going to search that car anyway regardless of the open container."  (DN 24 at 14).

 A. <u>Mayo did not fabricate smelling marijuana during the hearing.</u>

 The United States acknowledges that the Court's credibility assessment of Detective Mayo's testimony is a critical component of determining whether the inevitable discovery doctrine should apply.  As referenced earlier in this motion, there is an important piece of evidence previously unknown to the Court on this specific issue, that is, Detective Mayo's Investigative Report.  *See* Exhibit A.

 In the Memorandum Opinion and Order, the Court noted the defense argument that "**it was not until the suppression hearing, nearly a year after the initial stop, that Detective Mayo made such a claim**" about smelling marijuana.  (DN 36 at 13) (emphasis added). Another reason the Court found Detective Mayo not credible was that "the arrest citation made no mention of [Detective Mayo] observing the scent of marijuana."  *Id*. at 14-15.  Had he been asked at the hearing, or even known it was important to an issue that the United States would later raise (inevitable discovery), Detective Mayo could have explained why the arrest citation was not the appropriate place for that information.  Instead, that type of information would be included in the (sometimes referred to as Investigative Letter), that officers complete after the arrest or incident is over.

 And, that is exactly where Detective Mayo included the information about smelling marijuana.  Detective Mayo wrote in his "Investigative Report"-- done the very night of the stop:

"As Detective Mayo continued his communication with Mr. THOMAS, he [Detective Mayo] began to get a strong odor of marijuana coming from inside the vehicle."   *See* Exhibit A.  In fact, it was **not** nearly a year after the stop that Detective Mayo said he smelled marijuana.  He wrote it in his report that night.

As noted earlier, both defense counsel (despite saying otherwise in the defense post-hearing brief), and the prosecutor knew what Detective Mayo said in his Investigative Report. Here are the questions and answers when the prosecutor asked Detective Mayo about smelling marijuana:

Q.  Okay.  I noticed from the **police report** that you could [,] you stated that you could smell the marijuana?

A.  Yeah

Q.  When was that?

A.  Yes.  So when I started talking to Mr. Thomas, I mean, there was clear—marijuana only smells like marijuana.  There's nothing that smells like it . . .

Q.  Are you talking about burning marijuana, . . . ?

A.  Bagged marijuana in bud form; in its green form. You know, I could smell marijuana from right at that door when he got out of the car when I was talking to him.

(DN 24 at 12).  Since Detective Mayo testified in a manner consistent with the Investigative Report, the prosecutor did not tender it as an exhibit.  There was no way to anticipate that what was written, and when, would be significant.

Defense counsel also knew what the Investigative Report said about Detective Mayo smelling marijuana.   While cross-examining Detective Mayo about whether he really saw "furtive movements" in Thomas's car before it stopped, defense counsel said there was nothing about it in the arrest citation.  *Id*. at 30-31.  Defense counsel then asked, "Would there be any

other report that I could refer to where you would list that information [about the furtive movements]?"  Detective Mayo answered, "The only other thing I wrote was an investigative letter [the Investigative Report] . . ."  *Id*. at 31.  Defense counsel asked if she could see the investigative letter.  Detective Mayo handed his file to defense counsel and said, "You can see anything you need, ma'am.  It's going to be one or two pages back."  *Id.* at 31-32.  Counsel then read through the Investigative Report and asked when it was written.  *Id*. at 32.  As indicated on the Report itself, Detective Mayo said, "It was that evening.  It was the 4th."  *Id*.

 After reading the Report, defense counsel noted that there was no mention of "furtive movements."  *Id*.  Defense counsel did <u>not</u> mention, however, that the Report contained Detective Mayo's reference to smelling marijuana around Thomas's car.  The United States recognizes that it was not defense counsel's responsibility to make that point.  Yet, in its post-hearing brief, despite reading in the Report that Detective Mayo smelled marijuana, the defense said with emphasis that the suppression hearing was the "**first time** [] Detective Mayo claims that he smelled un-burnt green marijuana emanating from the vehicle."  (DN 29 at 9) (emphasis in original).  The defense makes a similar argument when it says in its post-hearing brief:  "It was not until the suppression hearing of this matter---almost a year after the arrest--that Detective Mayo claimed **for the first time** that the reason for the search was because he smelled marijuana."  (*Id*. at 20) (emphasis in original).

 Moreover, in addition to being wrong that the first time Detective Mayo mentioned smelling marijuana was at the suppression hearing, the defense now claims, <u>without citation to the record</u>, that the suppression hearing was the first time Detective Mayo said "<u>**the reason for the search**</u> **of the vehicle was because he smelled** <u>**marijuana**</u>**.**"  (DN 29 at 20).  Detective Mayo never said that.  At the suppression hearing, Detective Mayo was abundantly clear that the

reason for the search was the open container. (DN 24 at 13). He did say that if the open container had not been found, he would have searched because of the marijuana---but it never got to that point. *Id*. at 14. And he never said that smelling marijuana was the reason the car was searched.

B. Other factors concerning credibility

In addition to suggestion of recent fabrication, which has now been disproven, the Court also based its credibility conclusion on the following:

(1) "The Court identified three exchanges [on the body cams] where Detective Mayo asked his fellow officers if they smelled anything in the vehicle and not one of those officers responded in the affirmative."

(2) That Detective Mayo engaged in a "lengthy exchange" with Mr. Thomas about why Thomas was required to get out of the car--"If Detective Mayo had truly detected the odor of marijuana before asking Mr. Thomas to step out of his vehicle, as he testified, this exchange would likely have been different."

(3) That "Lieutenant King--the officer who actually discovered the baggies of marijuana during the stop--testified at the suppression hearing that smelling the scent of marijuana emanating from the vehicle was not something that stood out to him when recalling the stop."

(DN 36 at 15). Respectfully, the others reasons fail to support a finding that Detective May was not credible.

1. <u>What was said between Detective Mayo and others does not undermine his credibility. Even if others did not smell marijuana, Detective Mayo was the person who talked at length with Thomas at the car door and conducted the frisk, thus, being in the best position to smell marijuana.</u>

Detectives with the Louisville Metro Police Department's Ninth Mobile Unit (Detective Robbins, Detective Flynn and Detective Mayo) stopped a car driven by Kenneth Thomas on October 4, 2018. Before stopping the car, these detectives (who were in the car behind Thomas) saw that the driver (Thomas) and passengers (one in front seat and one in back seat) were not wearing seatbelts. (DN 24 at 6).

Detective Mayo was in the back seat of the unmarked police car driven by Detective Robbins, and Detective Flynn was in the front passenger seat of the police car. *Id*. at 7, 24-25. After seeing the no seatbelts, Detective Robbins activated the police lights and siren to get Thomas to stop. *Id*. at 7. Based on their experience, the police thought Thomas was slow to stop, "slow rolling" to take his time to stop rather than stopping immediately. *Id*. at 7, 8. ("It was an abnormal amount of time to pull over. It was longer than usual when someone hears lights and sirens."). Thomas even passed a gas station, which would have been a prime location for the stop. *Id*. at 27.

While waiting for Thomas to stop, Detective Mayo and Detective Flynn noticed a lot of movement in Thomas's car between the front seat and the back seat. *Id*. at 8 ("what was clearly observable . . . was movement from the front of the vehicle--the driver of vehicle moving back and forth to the person in the backseat . . . [t]here was movement going on from front to back, back to front."). The facts that the driver failed to immediately stop and that they saw "furtive movements" increased the officers' suspicion. One of the detectives in the car with Detective Mayo ran the license plate of Thomas's car. *Id*. at 9. The detectives learned that the owner of the car (Thomas) had an outstanding warrant for his arrest from Pennsylvania, but at that point they did not know whether it was for an extraditable warrant. *Id*. at 10, 44. Eventually Thomas stopped his car.

Detective Robbins walked toward the driver's side of the car, and Detective Flynn approached the passenger side of the car.[1] *Id*. at 9, 34; Robbins body cam starting at 00:43. (It is unclear from the record if Detective Robbins body cam is Exh. 3 or Exh. 4 introduced by the defense at the suppression hearing). Detective Mayo stayed back to watch in case either officer

---

[1] The Court's Memorandum Opinion and Order on the sequence of events is contradicted by the testimony and body cam video.

needed help.  (Robbins body cam at 00:59, 2:37).  That approach in police parlance is "contact and cover."  While an officer makes contact with a suspect, another officer provides "cover."  Detective Robbins told Thomas why the car was stopped, and then he got Thomas's driver's license, proof of insurance, and car registration.  Detective Flynn got the front passenger's driver license, but the back seat passenger said he did not have any identification on him.  That passenger (Craig Collins) gave Detective Flynn his correct name, date of birth, address, and social security number.

As was their practice in the Ninth Mobile Unit, every officer working that shift will patrol the same area (as determined by commanding officers based on crime statistics) and go to any scene where any of their detectives have a car stopped or other activity.  (DN 24 at 4, 6, 63, 64).  That happened here.  Other Ninth Mobile detectives arrived and created a perimeter cover to "make sure they [the detectives who made the stop] can do their job without interruption."  *Id*. at 64.  With the additional help there, Detective Robbins went to his computer to run Thomas's and the two passengers' names in several computer databases.  They soon found out that all three men were convicted felons.  The detectives were also trying to find out whether the Pennsylvania warrant for Thomas was extraditable.

In its credibility determination regarding Detective Mayo's smelling marijuana, this Court cited one of its reasons for the finding was that "the Court identified three exchanges where Detective Mayo asked his fellow officers if they smelled anything in the vehicle and not one of them responded in the affirmative."  (DN 36 at 15).  Presumably, one of those exchanges is when Detective Flynn walked away from Thomas's car toward Detective Mayo.  Detective Mayo wanting to know the situation in the car, asks Detective Flynn, "anything good?"  (Mayo body cam starting at 1:20).  Detective Flynn's response is virtually inaudible, but he waves his

hand like he is communicating I don't know, maybe.  *Id*. at 1:22.   Detective Mayo's question was a general one--he did <u>not</u> ask if Detective Flynn *smelled* "anything good?"  There is nothing wrong with asking questions to help assess the situation, and Detective Mayo did **not** ask Detective Flynn if he smelled anything good.  *Id*. at 1:20.

Shortly thereafter, when Detective Robbins joins Detective Mayo and Detective Flynn, Detective Mayo asked, "Did you guys get a whiff of anything, or . . .  is he giving you any problems?"  One of the detectives answers, "uh, he's not happy about being pulled over." *Id.* at 2:56.  This is the one time Detective Mayo asked that question about smelling anything.  But that is a reasonable question.  Remember, at this point, Detective Mayo had not approached Thomas's car and had not yet smelled the marijuana.  Moreover, Detectives Flynn and Robbins don't really answer whether they got a "whiff of anything," the response is just that Thomas is not happy about being pulled over.  Even if they had said they did not smell marijuana, such a statement would not require the conclusion that Detective Mayo lied.  Different people present at the same occurrence often see, hear, and or smell things differently.

The third "exchange" the Court seems to be referring to is between Detective Mayo and Sergeant. Casper.  Their conversation used the word "sense" not "scents."  Detective Mayo wanted Sergeant. Casper's assessment of the situation.  He did <u>not</u> ask if Sergeant. Casper smelled anything in the car.

Sergeant Casper had been talking to all three occupants in the car, standing by the front passenger's window.  Under the guise of making conversation, he was actually there to keep an eye on the occupants and to get a sense of what was going on with the three men -- while others were checking criminal records and whether the Pennsylvania warrant was extraditable. Sergeant. Casper walked back to where Detective Mayo was standing at around 5:24 on

Detective Mayo's body cam.  Although admittedly hard to hear clearly, Detective Mayo asked something like, ". . . you getting good sense in there?"  That was Detective Mayo's way of asking what Sergeant. Casper was thinking about the situation.  Sergeant Casper responded, "do what?"   Detective Mayo said it again, "are you getting any good sense in there?"  Sergeant. Casper said, "Nah, not really, the driver's kinda being a [expletive deleted]."  (Mayo body cam starting at 5:29).  Their discussion continued and is essentially inaudible.  Even if they were talking about "scents," keep in mind that Sergeant Casper had been talking to the occupants of the car on the passenger side.  Thomas, with the large baggie of marijuana in his pants pocket, was on the driver's side.

When cross-examining Detective Mayo, defense counsel asked, "And then you also asked, I think, Officer Casper when he walked up if he got a whiff of good scents in there, is that correct?"  (DN 24 at 39).  Detective Mayo answered, "I don't really remember," after noting "If it's on the body cam, I said it."  *Id*.  Although it is admittedly hard to hear, Detective Mayo did not say that to Sergeant. Casper.  Just as he had answered, Detective Mayo didn't remember.  *Id*.

Following up on her last question about what Detective Mayo said to Sergeant Casper, defense counsel asked Detective Mayo, " . . . Detective Casper answered you in the negative, he did not smell that; correct."  *Id*.  Detective Mayo said, "I don't remember that conversation whatsoever," but again Detective Mayo agreed that "if that's what's captured in the body camera, then that's what's captured."  *Id*.  Importantly, that is not what was captured on the video.

More thorough pre-hearing preparation (including, watching all of the body cam videos), or if the videos were shown during the suppression hearing, would h ave known what was said and could have explained what the conversation with Sergeant Casper really was about.  He

would not have found himself relying on defense counsel's interpretation of what was said on the body cam.

Both Detective Mayo and Sergeant Casper are willing to testify, if necessary, that they were <u>not</u> talking about whether Sergeant Casper smelled marijuana. And the correct word we hear on the body cam is "sense" not "scents." Detective Mayo and Sergeant Casper both understood that Detective Mayo's question was about whether Sergeant Casper, after talking with the occupants of the car, had a "good sense" of what was going on with the guys they stopped. At the time of his conversation with Sergeant Casper, Detective Mayo had not yet even smelled the marijuana. But the facts-- that Thomas took longer than usual to stop, the detectives saw movement between the front and back seats before the stop, and the owner of the vehicle had an outstanding warrant out for him--gave Detective Mayo reasons to wonder what these men were up to. He wanted Sergeant Casper's take on the situation. The only time Detective Mayo asked if anybody had smelled anything was when he asked detectives Robbins and Flynn, together, whether they got a "whiff of anything."

To compound the confusion, when unprepared to discuss the timeline and details of all the events, Detective Mayo incorrectly said he asked the others these supposed questions to corroborate what he smelled. (DN 24 at 38). In fact, as the defense noted, Detective Mayo asked the other detectives these questions **before** he had even smelled the marijuana. (DN 29 at 10-11). The questions were not to corroborate what he smelled. And there were not question**s** about whether others smelled marijuana, Detective Mayo only asked once (to detectives Flynn and Robbins) if they smelled anything of interest. And they didn't really answer the question-- they just said the driver was not happy about being pulled over.

Again, some officers' failure to smell marijuana doesn't mean that another officer couldn't. Certainly, it doesn't mean that someone who stated that he smelled marijuana lied about it. Detective Mayo was the one who spoke at length with Thomas at the car window, patted him down, and continued talking with him. It is reasonable to believe he smelled marijuana--and a large baggie of marijuana was in fact later found in Thomas's pants pocket.

### 2. Lt. King's Testimony

Still on the subject of what other officers' smelled, another of this Court's reasons for not finding Detective Mayo credible was that "Lieutenant King, the officer who actually discovered the baggies of marijuana during the stop---testified at the suppression hearing that smelling the scent of marijuana emanating from the vehicle was not something that stood out to him when recalling the stop." (DN 36 at 15).

Lieutenant King's first answer to the question of whether he smelled the odor of marijuana in the car, however, was "I don't recall." (DN 24 at 81-82). Of note, Lieutenant King was not close to Thomas, like Detective Mayo was, especially when Detective Mayo was patting Thomas down. Id. at 85. When defense counsel immediately asked the same question again, Lieutenant King simply said, "[t]hat doesn't stand out to me." Id. at 82. That's just another version of "I don't recall" or "I don't remember." Answers like that should not be used as a basis for a negative credibility finding regarding Detective Mayo.

### 3. The "exchange" between Detective Mayo and Thomas would not have been different based on the smell of marijuana before Thomas was asked to step out of the vehicle.

While other detectives were still working on the computer, after about six minutes and fourteen seconds from the time he turned on his body cam, Detective Mayo found out that Thomas was the one with the warrant. (DN 24 at 11). Knowing Thomas had an outstanding

warrant, but still not knowing whether it was extraditable, Detective Mayo wanted Thomas out of the car.  *Id*.  For "safety and tactical reasons," Detective Mayo didn't want to tell Thomas about the warrant while Thomas was still in the car.  *Id*.  Detective Mayo knew from his experience that if a driver knows that police know about an outstanding warrant, the driver will sometimes "flee, drive away, fight, whatever."  *Id*.  So, Detective Mayo went to Thomas (who was sitting in his car), and asked him to get out of the car.  *Id.* at 11-12.

While standing at the door of Thomas's car and talking to Thomas, Detective Mayo had a "clear" smell of marijuana.  *Id*. at 12, 14, 36.  He knew from the smell that it was "in bud form," that is, "in its green form."  *Id*.  Thomas did not want to get out of the car and questioned why it was required.  *Id*. at 11-12.  Detective Mayo named two Supreme Court cases that allowed him to have the occupants of a car get out during a traffic stop.   Thomas was still agitated but finally got out of the car.  *Id.* at 12.

As one of its reasons for finding Detective Mayo not credible, this Court noted that Detective Mayo "engage[d] in a lengthy exchange [about] why Mr. Thomas [was] required to [get out of the car] according to Supreme Court case law."  (DN 35 at 15).  This Court noted, "If Detective Mayo had truly detected the odor of marijuana before asking Mr. Thomas to step out of his vehicle, as he testified, this exchange would likely have been different."  *Id*.  Why? Detective Mayo wanted to keep the situation as calm as possible.  There was no reason for the "exchange" to have been different.  There had been a legitimate stop based on the no seatbelts, and Detective Mayo knew he was authorized to have Thomas get out of the car--especially since Thomas had an outstanding warrant out for him.

Bringing up the marijuana would have just given Thomas further reason to "flee, drive away, fight, whatever."  As Detective Mayo said at the suppression hearing, "I would rather not

have to use that stuff [about what police already know about a person] because it riles the situation up." (DN 24 at 61). Detective Mayo had already heard from other detectives that the Thomas was "not happy." And Thomas was giving Detective Mayo "some kind of pushback." *Id*. at 14. Detective Mayo was trying to deescalate the situation, build some rapport, and keep things from getting out of control. "I didn't want Mr. Thomas to know [what I knew], so I was trying to get him out of the car so we could have a safe conversation about it." *Id*. at 13.

Thomas got out of the car. The defense repeatedly claims in its post-hearing brief, as it did at the suppression hearing, that Thomas "was pulled" from the car. (DN 29 at 13, 14, 22, 23; DN 24 at 45, 47, 48). But, Mayo's body cam clearly shows otherwise. (Mayo body cam starting at 8:03). Neither Detective Mayo, nor any other person, even touches Thomas when he gets out of the car. *Id*. Thomas did not want to get out of the car, but he did--on his own accord. *Id*. No one pulled Thomas from the car.

Detective Mayo then patted Thomas down for weapons, and found none. Having his face so close to Thomas during the pat down, however, the smell of marijuana was even stronger to Detective Mayo. DN 24 at 14, 37, 48. "There was an odor of marijuana that I clearly smelled." *Id*. at 48. "[B]y the time I brought him [to the] back [of] the car, we had a very cordial conversation. We shook hands." *Id*. at 14. Detective Mayo started explaining to Thomas what was going on—that there was outstanding warrant for him, and that the police were trying to confirm whether it was extraditable. *Id*. at 13, 14, 49.

As previously noted, Detective Mayo explained why he wanted to handle getting Thomas out of the car in calm manner. It is better for everyone if the police can get compliance without resorting to the use of force--and that bringing up the marijuana would have made Thomas less compliant. Under all the circumstances here, it would only be (at most) an assumption that

Detective Mayo's "exchange [with Thomas] would likely have been different" if Detective Mayo really had smelled marijuana.  When realizing the importance of a police officer's credibility, and the serious consequences of being found not credible, such an assumption is too speculative to play any role in assessing Detective Mayo's credibility.

    4. <u>Other factors weighing on credibility</u>

  For a variety of reasons, there was considerable confusion at the suppression hearing about several things--in addition to the matters discussed above.  Although not specified by this Court as a reason for finding Detective Mayo not credible, the lack of consistency in answers, the inaccurate statements made in the United States' Post-Hearing Brief, and even the mistaken facts in the Memorandum Opinion and Order cast doubt on the efficacy of the hearing.  Under such circumstances, it is difficult at best to make a credibility determination.

    a. <u>Seized marijuana</u>

  For example, the Memorandum Opinion and Order notes that Lieutenant King found "baggies"--plural--of marijuana.  (DN 36 at 15).  While there was some inconsistent testimony at the suppression hearing, the reality is that Lieutenant. King found only <u>one</u> small baggie of marijuana deep inside a leather vest in the backseat, and Detective Hannah found the other larger baggie in Thomas's left pants' pocket.  (DN 24 at 12, 37).

  Detective Mayo initially testified that there were two baggies of marijuana in the car. *Id*. at 12.  Later in his testimony, however, he corrected himself and said that one baggie of marijuana was in the vest found in the car and one baggie was found in Thomas's pants pocket. *Id*. at 37.  The United States' post-hearing brief incorrectly referred to two baggies of marijuana found in the car.  (DN 26 at 4, 9, 10).

There were <u>not</u> two baggies of marijuana in the car.  The larger bag of marijuana was in Thomas's pocket when Detective Mayo talked to Thomas at the driver's door and then frisked him.  Therefore, it is reasonable that Detective Mayo smelled marijuana.  Since this Court referred to Lieutenant. King finding the baggies**,** the Court might not have realized that the larger bag of marijuana was in Thomas's pants pocket.  The fact that the larger bag was in Thomas's pocket corroborates Detective Mayo's testimony about smelling marijuana.  And, mistaken information in the United States' post-hearing brief case should fall on the shoulders of the United States -- not Detective Mayo.

   b. <u>Who made the decision to search</u>

While Thomas and Detective Mayo were talking, Detective Mayo noticed other officers searching Thomas's car.  Detective Mayo immediately went to ask if they had found something that established probable cause.  (Mayo body cam starting 10:47).  Another detective told Detective Mayo that an open container of alcohol had been found.  *Id.*  Detective Mayo said, "It's always common practice that when you find an open container that you are able to search." (DN 24 at 52).  Lieutenant King confirmed that finding an open container of alcohol in a car "gives us reason to look in the vehicle just in case there's other alcohol in the vehicle."  *Id.* at 66. The authority to search a car based on an open container of alcohol is much more limited that the police believed it to be.  The United States, earlier in this motion, conceded this legal issue.

At that point, Detective Mayo had not told others that he smelled marijuana around Thomas's door and on Thomas's person.  If not telling other people about the marijuana is being used against Detective Mayo to find him not credible, then several counter-points need to be considered.  First, Detective Mayo smelled the marijuana when talking with and then patting down Thomas.  He was not talking to anyone except Thomas.  Second, once the police found the

open container, they thought they had probable cause--and Detective Mayo's smelling of marijuana essentially became irrelevant.  Third, smelling marijuana in the cars they stop is common for Ninth Mobile Detectives.  They smell it, and find it, every day they work.  It is not something that necessarily sticks out as being different or exceptional.

The defense in its post-hearing brief says, "It was not until [Detective Mayo] was told that there was open container in the vehicle that he gave the green light to search."  (DN 29 at 21).  The purpose of the statement isn't clear.  What is clear, however, is that the statement simply is not true.  Detective Mayo never "gave the green light to search."  As stated earlier, Detective Mayo was busy talking with Thomas when he noticed other detectives searching the car, and he went over to ask why.  (Mayo body cam at 10:48; DN 24 at 13).  Detective Mayo did say because he "smelled [marijuana] on contact with Mr. Thomas, I would have eventually searched that vehicle . . .. But it didn't come to that" because of the open container.  (DN 24 at 53).

It is somewhat understandable, however, why the defense would say that the search did not start until Detective Mayo gave the "green light" (despite what was clearly seen in Detective Mayo's body cam).   Lieutenant King testified several times that he relied on Detective Mayo to make the decision to search.  *Id.* at  67, 81, 82, 85.  Even the United States' post-hearing brief included language that, "After advising Mayo [about the open container] and receiving the go-ahead, King searched the vehicle[]."  (DN 26 at 5).  However, as clearly seen on Detective Mayo's body cam and noted in his testimony, Detective Mayo didn't even know the search was going on.  He was busy talking with Thomas (after Thomas got out of the car), and noticed the search going on.  Detective Mayo then went to find out why.

After finding out why the detectives were searching the car, Detective Mayo returned to Thomas. Within a few seconds, one of the detectives said 10-38 which is police code for firearm. (Mayo body cam starting at 11:13; DN 24 at 13). Lt. King had found a gun in a motorcycle gang vest in the backseat of Thomas's car. (DN 24 at 37, 74, 75, 86). Police also found a small amount of marijuana and the title to a motorcycle (in Thomas's name), in the vest. *Id*. at 75. At that point, Thomas and his two passengers were handcuffed. (Mayo body cam starting at 11:13). They were advised that they were not under arrest.

Detective Mayo began searching the car when he was no longer with Thomas. (Mayo body cam starting at 12:19). Detective Hannah asked Detective Mayo if he had searched Thomas, and Detective Mayo said no, he had only patted him down. (Mayo body cam at 15:50). Detective Hannah then searched Thomas and found a larger baggie of green marijuana in Thomas's left front pants pocket. (Mayo body cam at 16:43; DN 24 at 37).

Knowing all three of the occupants were convicted felons and not allowed to possess a firearm, the detectives discussed who they should arrest because all of the occupants constructively possessed the gun. The question was who was doing it knowingly. Because the motorcycle title linked Thomas to the vest with the gun, he was arrested. And because the detectives saw the back seat passenger moving things around when the police tried to stop them, and he was sitting right by the vest, police arrested that passenger too.

IV.    Credibility determination

Based on the Memorandum Opinion and Order, it is clear that this Court believed the vast majority of Detective Mayo's testimony. The Court's only concern was whether Detective Mayo smelled marijuana: "[T]he Court finds that Detective Mayo's suppression hearing testimony **on this score** is not credible." (DN 26 at 16) (emphasis added).

21

Detective Mayo had no reason to lie about smelling the marijuana. At the scene and when he testified, Detective Mayo thought the stop and search were already justified (by the no seat belts and the open container).  There would have been no reason to make up smelling marijuana when he thought probable cause was already established.

At the time he testified, Detective Mayo did not know that the defense was arguing that the open container statute was just a violation and couldn't provide probable cause.   He had no way of knowing that inevitable discovery would be asserted by the United States.   Certainly, the United States could have taken better preparatory and presentation steps.  Detective Mayo had no reason to make up a story about smelling marijuana.  And the fact that smelling the marijuana is referenced in his Investigative Report, prepared the night of search, further supports that he was not lying.

The portion of the Memorandum Opinion and Order concerning Detective Mayo's credibility has a far-reaching, detrimental effect on Detective Mayo's career in law enforcement. It will require *Giglio* disclosures and, effectively, precludes him from positions in law enforcement that require sworn testimony.

<u>CONCLUSION</u>

The United States respectfully requests reconsideration of the Court's Memorandum Opinion and Order in several respects.  For all of the reasons set forth above, we ask the Court to reconsider and remove the credibility determination from its Memorandum Opinion and Order. Consequently, the United States believes that is has shown, through a preponderance of the evidence, that the firearm would have been inevitably discovered as a result of searching the car due to the smell of marijuana.

Of course, the Court may certainly disagree.  Therefore, in the alternative, a finding that the United States failed to meet its burden can be made without determining that Detective Mayo was not credible.  Detective Mayo, as demonstrated by his Investigative Report along with the fact that marijuana in its unburnt form was found on Thomas and in his car, was telling the truth. That he came across as not credible to this Court on the issue of smelling marijuana may fairly be attributed to a lack of preparation to fully understand all potential issues.  It is the United States' responsibility to properly prepare witnesses, present evidence, and clearly set forth the United States' position on any given issue.

Finally, if this Court is not satisfied with the explanations proffered in this Motion to Reconsider, as well as the Investigative Report, then the United States, in the second alternative, moves to reopen the suppression hearing to allow Detective Mayo to present direct testimony about what he did, why he did it, and to formally introduce his Investigative Report.

Respectfully submitted,

RUSSELL M. COLEMAN
UNITED STATES ATTORNEY

/s/  *Jo E. Lawless*
Jo E. Lawless
Assistant United States Attorney
717 West Broadway
Louisville, Kentucky 40202
(502) 625-7065
(502) 582-5912 (fax)

## CERTIFICATE OF SERVICE

A copy of the foregoing was served on defense counsel through the Court's ECF system on February 21, 2020.

/s/ *Jo E. Lawless*
Jo E. Lawless
Assistant United States Attorney